# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3174

_____

Glenn Ault, Jr.,                            *
                                            *
              Appellant,                    *
                                            *  Appeal from the United States
        v.                                  *  District Court for the
                                            *  Eastern District of Arkansas.
William B. Brady; Impact Financial          *
Services, L.L.C., an Arkansas Limited       *       [UNPUBLISHED]
Liability Company,                          *
                                            *
              Appellees.                    *

_____

Submitted: May 17, 2002
Filed: June 14, 2002

_____

Before BOWMAN, MAGILL, and BYE, Circuit Judges.

_____

PER CURIAM.

Glenn Ault, Jr. appeals from several adverse orders of the district court[1] in favor of William Brady and Impact Financial Services, L.L.C. ("IFS"), in this diversity case. For the reasons discussed below, we affirm.

_____

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

I.

On June 11, 1998, IFS was formed as a manager-managed Arkansas limited liability company for the purpose of marketing a "non-sufficient funds" fee enhancement process to banks. The initial members of IFS and their respective initial interests were as follows: Brady, forty-seven units; Sam Pierce, forty-seven units; Boulderfield (a corporate entity owned equally by Brady and Pierce), four units; and Ault, two units.[2] Effective June 12, 1998, Brady, Pierce, and Ault entered into an IFS Operating Agreement, which specified that Brady would be the managing member. IFS employed Ault as a "scout" or salesman on an independent contractor basis.

By June of 1999, Brady and Pierce were involved in a power struggle, and Ault acted as a go-between in an attempt to reach an agreement or compromise. On July 21, 1999, Brady sent Pierce a letter requesting his resignation by July 30 in lieu of termination. Brady also sent a copy of the letter to Ault. On July 27, 1999, Pierce contacted Ault and offered to transfer his units in IFS to Ault. Ault agreed and paid Pierce $150 for Pierce's forty-seven units and $50 for Pierce's two Boulderfield units. The next day, Pierce e-mailed Brady and informed him that he would not resign. Two days later, on July 30, 1999, Brady terminated Pierce "for cause" and informed Pierce that IFS would exercise its option to purchase his units within sixty days.

In one final effort to resolve the situation, on August 5, 1999, Brady, Pierce, and Ault held a "members meeting" in Little Rock. It was during this meeting that Ault revealed to Brady that he owned Pierce's units. Upon learning this information, Brady demanded that Ault turn the units over to IFS, which Ault refused to do. Consequently, in a letter dated August 11, 1999, Brady terminated Ault "for cause" and informed Ault that IFS would buy back all the units he owned pursuant to section

_____

[2]Ault paid twenty dollars for his two units.

-2-

7.2(b) of the Operating Agreement.[3] Ault responded by taking the position that Brady had no cause to terminate him and that because he was an independent contractor rather than an employee, section 7.2(b) was not applicable to him and therefore IFS could not buy back his units. On August 31, 1999, Brady executed a "buy-out" letter informing Ault that "the purchase price or consideration that [IFS was] offering [was] 'relief from liability.'"[4] Ault responded by filing the instant lawsuit against Brady and IFS.

Ault's original suit, filed on August 30, 1999, sought dissolution of IFS. On August 24, 2000, Ault filed a first amended complaint alleging breach of contract, breach of fiduciary duty, breach of the covenant of good faith and fair dealing or, in the alternative, dissolution. Following discovery, the district court, sua sponte, limited the initial phase of the trial to the issue of whether Ault legally acquired Pierce's ownership interest in IFS and the propriety and impact of Brady's termination of Ault. After a bench trial, the district court found that the transfer from Pierce to Ault was a valid conveyance of Pierce's economic interest in the units transferred, but the transfer failed to convey any voting rights. The district court further found that Brady acted within his authority in terminating Ault's services, but the termination was "without cause." Thus, the district court concluded that IFS has the right to acquire Ault's units for their fair market value ("FMV") rather than the value of Ault's capital account. Phase two of the case was limited to the calculation of the FMV of Ault's shares, which the district court found to be zero. Ault now appeals. We review the district court's interpretation of a contract and application of state law de novo.

---

[3]Section 7.2(b) of the Operating Agreement provides that "[u]pon the termination of employment of a Member with the Company . . . the Company shall have the option to purchase the Units owned by the Member, directly or indirectly through another entity, for the price and upon the other terms hereinafter provided."

[4]Under the Operating Agreement, Section 2, Exhibit B, a member terminated "for cause" is entitled only to the value of his capital account.

<u>Lyster v. Ryan's Family Steak Houses, Inc.</u>, 239 F.3d 943, 945 (8th Cir. 2001); <u>Clark v. Kellogg Co.</u>, 205 F.3d 1079, 1082 (8th Cir. 2000).

## II.

Ault argues that the district court erred in holding that the Pierce-Ault transfer transferred only economic interests and did not vest in Ault any rights to manage the affairs of IFS or exercise voting control over Pierce's units. We agree with the district court that the Pierce-Ault transfer occurred in connection with Pierce's voluntary withdrawal from IFS. According to section 7.1(f) of the Operating Agreement, however, a member is not allowed to voluntarily withdraw from the company. As such, section 2.1(a) of the Operating Agreement defines a withdrawal as an "adverse act."[5] Consequently, pursuant to section 11.1 of the Operating Agreement, the rights to Pierce's units acquired by Ault were limited to the right to receive distributions.[6] Ault argues, however, that the transfer of units in this case is outside the provisions of section 11.1 because section 11.1 only applies to non-members. In making this argument, Ault relies on the term "substituted" in the second sentence of section 11.1, i.e., "Any person acquiring rights with respect to any interest in the Company in a

---

[5]Section 2.1(a) of the Operating Agreement states: "'Adverse Act'" means, with respect to any Member, any of the following: (i) the transfer in violation of Section 11.1 hereof of all or any portion of such Member's interest in the Company; (ii) an Event of Bankruptcy with respect to such Member; or (iii) withdrawal from the Company."

[6]Section 11.1 provides:

> No member shall sell, assign, transfer, pledge or encumber any interest in the Company without the prior written consent of the Manager and the other Members. Any person acquiring rights with respect to any interest in the Company in a transaction which is an Adverse Act shall not be deemed a substituted Member and shall be restricted to the right to receive any distributions made with respect to such interest.

transaction which is an Adverse Act shall not be deemed a <u>substituted</u> Member . . . ." (emphasis added). Ault contends that because he was already a member prior to purchasing Pierce's units, it is impossible for him to be a "substituted" member, thereby rendering section 11.1 inapplicable. Ault's argument is unconvincing.

First, section 11.1 does not expressly limit transfers covered by the provision to only non-member transfers. Instead, section 11.1 states that <u>no</u> transfers shall be made without the consent of the members regardless of to whom the transfer is made. Second, the second sentence of section 11.1 also does not limit the provision to only non-members. Instead, the clause applies to "any person" acquiring rights, which clearly would include members and non-members alike. Finally, the phrase "substituted member" in section 11.1 can only logically be viewed in terms of units, i.e., a substituted member with respect to particular units of interest, which by the definition of "Units" in the Operating Agreement is an economic measurement.[7] In other words, after the Pierce-Ault transfer, Ault remained a member with regard to his initial two units, but he gained only economic rights with respect to the additional forty-nine units he acquired from Pierce.[8] Thus, we hold that the district court correctly determined that Ault acquired only economic interests in Pierce's units.

Ault's next argument, suggesting that the repurchase provision of section 7.2(b) of the Operating Agreement is inapplicable to him because he is an independent contractor and not an employee, is without merit. Section 7.2(b) speaks in terms of "employment," not in terms of an "employee" or an "independent contractor," i.e.,

---

[7]Section 2.1(r) of the Operating Agreement defines "Units" as "a method of measurement of the profits interests of a Member in the Company. The total of the Units shall constitute 100% of the profits interests in the Company."

[8]This result is also dictated by Arkansas's Limited Liability Company statute, which states that "[a]n assignment [of interest] entitles the assignee to receive, to the extent assigned, only the distributions to which the assignor would be entitled." Ark. Code Ann. § 4-32-704(a)(2) (Repl. 2001).

"Upon the termination of <u>employment</u> of a Member with the Company . . . the Company shall have the option to purchase the Units owned by the Member . . . for the price and terms hereinafter provided." (emphasis added). The technical distinction between "employee" and "independent contractor" that Ault espouses is unnecessary unless the context requires such a distinction, e.g., in the context of respondeat superior. We find such a distinction unnecessary in this case. Moreover, the relationship between a principal and an independent contractor is routinely referred to as one of "employment." <u>See, e.g.,</u> <u>Read v. Medical X-Ray Ctr., P.C.</u>, 110 F.3d 543, 544 (8th Cir. 1997) ("MXC agreed to <u>employ</u> Read as an independent contractor.") (emphasis added). Finally, to adopt Ault's argument would lead to the illogical result that IFS could reacquire the units of a terminated employee but not those of an independent contractor. Thus, we hold that the district court did not err in finding that Brady had the authority to terminate Ault's services and reacquire Ault's units pursuant to section 7.2(b) of the Operating Agreement.

Ault's next point, arguing that the district court erred in failing to find that Brady breached his fiduciary duty when Brady terminated him and attempted to force him to sell his units back to IFS, is also without merit. Under Arkansas law, a manager of a limited liability company is not liable to the company or other members unless he engages in "gross negligence or willful misconduct." Ark. Code Ann. § 4-32-402(1) (Repl. 2001). Section 6.2 of the Operating Agreement grants Brady broad authority to "make all decisions regarding the management of the Company" and responsibility "for all administrative matters affecting the Company or its business." Under these broad powers, Brady acted well within his authority in terminating Ault. Moreover, as discussed above, Brady's conduct in attempting to reacquire Ault's units is permissible pursuant to section 7.2(b) of the Operating Agreement.

Ault's final point of contention concerns the district court's decision not to deviate from the parties' agreed upon method of determining the FMV of Ault's units, even though that value turned out to be zero. Following the district court's decision

-6-

that IFS could elect to purchase Ault's units at the FMV, the parties entered into a stipulation, proposed by Ault, whereby independent accountants would calculate the FMV of Ault's units. Pursuant to the stipulation, each party was to select one certified public accountant ("CPA"), and the two selected CPAs were to choose a third. All three CPAs were then instructed to appraise the FMV of Ault's interest using a narrow contractual definition of FMV. The appraisal that was the most different from the other two was to be disregarded, with the FMV being the average of the two remaining appraisals.

The CPA chosen by Brady and the CPA chosen by the two CPAs valued Ault's units at zero. The CPA chosen by Ault valued Ault's units at $2.2 million. Accordingly, the district court concluded that Ault was bound by the result reached pursuant to the stipulation on both contract and estoppel principles, and therefore it accepted the FMV of zero. While Ault concedes that he is bound by the stipulation, he nevertheless argues that the stipulation carried with it an implied duty of good faith and fair dealing, which includes the duty to follow customary and usual accounting standards. Essentially, Ault's argument is nothing more than an attack on the CPAs' methodology, which was stipulated to in the parties' agreement. Therefore, we agree with the district court that the stipulation is binding on Ault on both contract and estoppel principles and that he cannot now be heard to complain merely because he does not like the outcome.

III.

For the reasons discussed above, we affirm the numerous orders of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.